SOUTHERN PAC. CO. et al. v. RAILROAD COMMISSION OF OREGON et al.

(District Court, D. Oregon. September 29, 1913.)

Nos. 5,860, 5,845–5,847, 5,849–5,852.

CARRIERS (§ 2\*)—CONSTITUTIONAL LAW (§§ 242, 298\*)—STATE REGULATION OF RATES—VALIDITY OF STATUTE.

The Oregon Initiative Act adopted November 5, 1912, relating to classification ratings of property transported by railroads wholly within the state, considered, and *held* unconstitutional and void as depriving the railroad companies of their property without due process of law and denying them the equal protection of the laws and constituting an unreasonable interference with their business, in that its provisions are not only incongruous and inconsistent with themselves, but by fixing an absolutely rigid percentage spread between car load and less than car load rates without regard to the commodity carried, the origin of shipment or distance of carriage would compel the carriers in some cases to accept unreasonably low rates on car load lots or to establish unreasonably high and unlawful rates on less than car load lots.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 4, 5; Dec. Dig. § 2;\* Constitutional Law, Cent. Dig. §§ 691, 847; Dec. Dig. §§ 242, 298.\*]

In Equity. Suits by the Southern Pacific Company and the Oregon & California Railroad Company, by the Oregon-Washington Railroad & Navigation Company, by the Spokane, Portland & Seattle Railway Company, by the Oregon Electric Railway Company, by the Northern Pacific Railway Company, by the United Railways Company, by the Pacific & Eastern Railway Company, and by the Oregon Trunk Rail-

way, against the Railroad Commission of Oregon; Clyde B. Aitchison, Thomas K. Campbell, and Frank J. Miller, as Commissioners, members of and constituting said Railroad Commission of Oregon; A. M. Crawford, as Attorney General of the State of Oregon; George J. Cameron, as District Attorney of the Fourth Judicial District of the State of Oregon; E. B. Tongue, as District Attorney of the Fifth Judicial District of the State of Oregon; John H. McNary, as District Attorney of the Third Judicial District of the State of Oregon; Edwin R. Bryson, as Prosecuting Attorney of the Fourth Prosecuting Attorney District of Oregon; B. F. Mulkey, as Prosecuting Attorney of the First Prosecuting Attorney District of Oregon; and George M. Brown, as Prosecuting Attorney of the Third Prosecuting Attorney District of Oregon. Final hearing on bill and answer. Decree for complainants.

Wm. D. Fenton, Ben C. Dey, R. E. Moody, and Kenneth L. Fenton, all of Portland, Or., for complainants Southern Pac. Co. and Oregon & C. R. Co.

W. W. Cotton and A. C. Spencer, both of Portland, Or., for complainant Oregon-Washington R. & Nav. Co.

Carey & Kerr and C. A. Hart, of Portland, Or., for complainants Spokane, P. & S. Ry. Co., Oregon Electric Ry. Co., Northern Pac. Ry. Co., United Rys. Co., Pacific & E. Ry. Co., and Oregon Trunk Ry.

A. M. Crawford, Atty. Gen., and I. H. Van Winkle, Asst. Atty. Gen., both of Salem, Or., for defendants.

Before GILBERT, Circuit Judge, and WOLVERTON and BEAN, District Judges.

WOLVERTON, District Judge. These suits are instituted by the transportation lines against the State Railroad Commission and the District Attorneys of the several judicial districts of the state to enjoin the putting into operation and the enforcement of an Initiative Act adopted by the people November 5, 1912. Demurrers to the bills were first interposed. These were overruled, and the causes were finally submitted on bill and answer. The act, with its title, is in language following:

"An act entitled 'An act to provide for a uniform percentage in the relationship of the classification ratings, providing for the establishment of minimum car load weights, to fix the maximum rate on basis of the less than car load rate of the article and the minimum car load weight that may be charged on car load shipments of property, defining the rating upon which the car load rate shall be computed, and prescribing penalties for violations of the provisions of the act.'

"Be it enacted by the people of the state of Oregon:

"Section 1. The classification ratings of freight shall bear a uniform relationship of one class to another class, and the percentage of the first class shall be 100, and the other classes shall be the following percentages of the first class:

| Classes | 1 | 2 | 3 | 4 | 5 | A | B | C | D | E |
|---|---|---|---|---|---|---|---|---|---|---|
| Percentages | 100 | 84 | 70 | 59 | 50 | 42 | 35 | 29 | 24 | 20. |

"Sec. 2. A minimum car load weight shall be provided for each article, but no minimum car load weight shall be greater than the actual weight that can be loaded in a car, nor shall a small minimum car load weight be fixed with

the sole object to secure a high car load rate. Where no minimum car load weight is provided for each article by a railroad, or fixed by an order of the Railroad Commission of Oregon, the minimum car load weight shall be 30,-000 pounds.

"Sec. 3. It shall be unlawful for any railroad, as the term is defined in chapter 53, Laws of Oregon for the year 1907, creating a railroad commission, to demand, charge, collect or receive a greater compensation for the transportation of property in car load lots than the following: When the minimum car load weight for an article is fixed at 20,000 pounds or less the car load rate shall not exceed 70 per cent. of the less than car load rate provided for the article. When the minimum car load weight for an article is fixed at more than 20,000 pounds and not in excess of 30,000 pounds the car load rate shall not exceed 59 per cent. of the less than car load rate provided for the article. When the minimum car load weight for an article is fixed at more than 30,000 pounds and not to exceed 40,000 pounds the car load rate shall not exceed 50 per cent. of the less than car load rate provided for the article. When the car load minimum weight for an article is fixed in excess of 40,000 pounds the car load rate shall not exceed 42 per cent. of the less than car load rate provided for the article.

"Sec. 4. When two or more less than car load ratings are given an article the car load rate shall be computed on the lowest less than car load rating given the article, and when two or more articles are permitted to be shipped, or are provided to be shipped, as a mixed car load the car load rate shall be computed on the article contained in the car load which is given the highest less than car load rating.

"Sec. 5. If any railroad shall demand, charge, collect or receive a greater compensation for the transportation of car loads of property between points wholly within the state of Oregon as provided in section 3 of this act, it shall be deemed guilty of a misdemeanor and upon conviction thereof shall be punished for each offense by a fine of one hundred dollars and the cost of the prosecution.

"Sec. 6. Each car load shipment against which an unlawful charge is made shall constitute a separate offense."

In epitome, the effect of the act is to provide, by its first section, a standard for the classification ratings of freight, to require, by its second section, that a minimum car load weight be provided for each article, and, by its third, to establish a maximum percentage of rates for minimum car load weights with reference to less than car load charges, above which it is declared to be unlawful for the carrier to charge or receive compensation for the service of transportation. A penalty of $100 and costs is imposed for each offense of charging or receiving an excessive rate; each car load constituting the basis of a separate offense.

In the development of rate regulation, there has been brought into vogue for the territory west of Chicago, including the Pacific Coast states, what is known as the "Western Classification," which is made the basis or standard for the classification of all freight for the purpose of establishing the rates and charges for transportation by rail. This classification has been recognized and adopted by the Interstate Commerce Commission, and also by the Railroad Commission of Oregon, and is as follows:

| Classes | 1 | 2 | 3 | 4 | 5 | A | B | C | D | E |
|---------|-----|----|----|----|----|----|----|----|----|-----|
| Percentages | 100 | 85 | 70 | 60 | 50 | 50 | 40 | 30 | 25 | 20. |

Generally, perhaps not universally, the first four classes have been used in practice for fixing the schedule rates pertaining to less than

car load freight, and the other six classes have been adopted as the standard for ratings on car load shipments. There appears to be no rule among carriers requiring ratings to be so made, nor is there any law imposing the obligation. It is simply a usage that has grown up in the effort to establish rates for the carriage of freight, and the authorities intrusted with the power of imposing reasonable and undiscriminating rates have adopted it as convenient and useful in regulation.

It may be further noted that less than car load freight is loaded and unloaded by the carrier, while the car load freight is loaded and unloaded by the shipper. This fact, and the fact that the larger the car load the less, proportionately, is the expense of carriage, are dominant features in rendering less than car load rates higher than car load rates.

Before passing from the subject, it should be understood that it is not requisite in usage, nor by the exactions of the Interstate Commerce or the State Railroad Commission, that all freight shall be rated according to classification. There are certain commodities which are carried in large quantities that are excepted from the classification and permitted to take exceptionally low rates, which are called commodity rates. By rule 36 under the Western Classification, whenever a car load (or a less than car load) commodity rate is established, it removes the application of class rates to or from the same points on that commodity in car load quantities (or less than car load quantities, as the case may be), except when the alternative use of class and commodity rates is provided for. So that a commodity may be excepted from the classification, and a specific rate provided for both car load and less than car load, and when so provided it becomes the controlling rate without reference to the classification.

Referring to the classification and the practice and usage pertaining thereto as previously existing, not all articles of commerce are given car load rates in the classification, and many articles accorded such rates are made to depend upon the manner in which they are prepared for shipment. Whether all commodities having classification in car load rates also have classification in less than car load rates, we are not prepared to say. It will be noted that the classification under the Initiative Act differs from the Western Classification in several particulars. Mr. Frank H. McCune, who is the author of the Initiative Act, gives as the reason for adopting the former classification that uniformity might obtain in the descending scale in the ratio of approximately 84 per cent. of the preceding class. We quote his language:

"It has been observed that the ratios used to prescribe the relationship that shall exist between the various classes have been followed with slight variations from the outset of steam railroads, and the rule in section 1 of the Initiative Act merely fixes these uniformly on a descending scale of approximately 84 per cent. of the preceding class in lieu of the irregular variation of the intermediate classes as contained in the Commission's scale."

This is the only reason assigned for making the changes in classification. Standing alone, if the classification feature were the only purpose of the act, it might serve in practice for rate-making as well or

better than the old method. As to this, however, we do not now express an opinion. But in order to arrive at the true purpose and meaning of the classification, as well as of the entire act, all of the provisions of the act must be read together and thus construed.

By the first section of the Initiative Act, classification ratings must bear a uniform relationship between classes; the table of classes with their percentages being prescribed. Section 2 makes it incumbent upon the carrier to provide a minimum car load weight for each article. It is not required that all freight shall be classified, for the statute does not command as much, though it would seem that all freight not excepted out of the classification and given commodity ratings should be classified. But the injunction of section 2 covers all freight, for a minimum car load weight is required to be provided for each article thereof. This covers freight, whether classified or given exceptional or commodity ratings. This section and section 3, when read together, presuppose that a less than car load rate has also been fixed for each article. Section 3 provides for a maximum percentage for a car load with reference to the less than car load rate. Thus it will be observed that the statute is not dealing with, nor does it pretend to provide, maximum rates above which it is rendered unlawful for the carrier to make a charge, but it deals with a maximum percentage for a minimum car load, having relation to the less than car load rate. Thus it is rendered unlawful for the carrier to charge a greater compensation or rate than 70 per cent. of the less than car load rate provided when the minimum car load weight is fixed at 20,000 pounds or less. And so, by gradation, if the car load weight is more than 20,000 pounds, and not in excess of 30,000 pounds, the percentage is not to be more than 59 per cent. of the less than car load rate; if above 30,000 pounds, and not in excess of 40,000, 50 per cent.; and, if in excess of 40,000 pounds, 42 per cent.

These regulations apply to all freight, whether taking classified or commodity rates, but in application under the classification table they will be found somewhat incongruous. It will be found in many instances—indeed, very many—that the 70 per cent., or the 59 per cent., or the 50 per cent., etc., as the case may be, of the less than car load rate, will not conform to any lower classification of the same article, assuming that the article has received a less than car load rating in classification. To illustrate, take an article X, and we will suppose that it is assigned to classification 3 for fixing a less than car load rate, which would be 70; that being the classified percentage of 100, the first-class rate. A minimum car of 20,000 pounds or less takes a maximum rate of 70 per cent. of the less than car load rate, which would bring the rate of the car load to 49 cents. Under section 3 of the act the carrier is entitled to this maximum of 49 cents as compared with first class, but the classification gives him but 42 cents as the highest rate obtainable, for he cannot charge 50 cents, the nearest classified rate to 49 cents, as that would be in excess of 70 per cent. of the less than car load rate. So, if the minimum car weight is more than 20,000 and less than 30,000, the maximum percentage of 59 applied to

the 70-cent less than car load rate gives as a result 41.30 cents, and we find no classified rate conforming to that. The nearest is 42, but the carrier cannot take that, and must take the next lower, represented by B, or 35 cents, or else revise his less than car load rating. If, however, the minimum car carries 30,000 pounds and less than 40,000, it would take a rate of 50 per cent. of less than car load, with a result of 35 cents for car load classification. This would conform exactly with class B, and the carrier would get all under the classification that the maximum percentage would give him under section 3 of the act. This illustration is a demonstration that the carrier cannot in many cases, if not the greater proportion, obtain his maximum rate under section 3, and at the same time adjust his ratings according to the classification table prescribed by section 1. As to the commodities given exceptional ratings for less than car load, there would be no inharmony, for the classification does not apply; but, as to classification, the first three sections of the act are incongruous and wholly irreconcilable, and cannot be observed in practice unless the carrier waives some portion in many cases of the maximum percentage of the less than car load rate, and this the law does not require of him. The act therefore cannot be enforced without doing injustice to the carriers, which is tantamount to taking property without due process of law.

There is yet another feature of the act which requires notice. It exacts an arbitrary and perfectly rigid spread between the car load and less than car load rates, and this applies to all kinds of articles and commodities offered for transportation, whatever their character and regardless of the length of carriage. To illustrate the effect of the act as compared with present operation under the Railroad Commission Act, it is alleged by the complainants, and not controverted by the defendants, that articles moving under the fifth class in car load lots are classified in most part as fourth class in less than car loads. Under the Initiative Act, fourth class is 59 per cent. and fifth class 50 per cent. of first class. Taking, therefore, a minimum car load weight of more than 30,000 and less than 40,000 pounds, the maximum relative rate under the act is 50 per cent. of the less than car load rate and 50 per cent. of the fourth class, or 59 cents, would make the car load rate 29.50 cents, which would be less than class B and slightly greater than class C, thus making the spread three points, and nearly four, whereas, under the old law and as classified, the spread was but one point covering one class. This is an instance where the application of the maximum relative to the less than car load rate would greatly reduce the cost of transportation from that which obtained under the old law, namely, from 50 per cent. to 29½ per cent. of first class.

Other instances are shown where the result is to very greatly increase the rate of carriage in car loads. For instance, it is shown that the present rate on 30,000-pound minimum weight from Woodburn to Salem is 5½, while under the Initiative Act it would be increased to 7.84. Another instance among many is found in the transportation of

logs from Wendling to Coburg. The present rate is $1.10 per 1,000 feet. Under the act the rate would be increased to $4.36. Still another, respecting the commodity soft wood, is demonstrated by the following table, found at page 64 of the Southern Pacific Company bill:

"Rates in Cents Per Cord.

| Commodity | 10 Miles | 20 Miles | 30 Miles | 40 Miles | 50 Miles | 60 Miles | 70 Miles | 80 Miles |
|---|---|---|---|---|---|---|---|---|
| Soft Wood—CL Min. Wt. 50,000 lbs. | | | | | | | | |
| Present Rate | 70 | 80 | 90 | 100 | 110 | 120 | 130 | 140 |
| New rate | 93.6 | 136.8 | 172.8 | 201.6 | 230.4 | 252 | 280.8 | 304 |
| Advance | 23.6 | 56.8 | 82.8 | 101.6 | 120.4 | 132 | 150.8 | 164 |
| Reduction | | | | | | | | |

Western Classification Rating: Car loads, Class E, Min. Wt.

36,000 lbs.

Less car loads, 3d Class.

Rate per cord under new rate made by estimating weight per cord at 3,600 lbs."

Thus it will be found that, in the application of car load rates under the Initiative Act, assuming that the less than car load remains the same, the rates will be largely increased for the carriage of coal, hay and straw, lumber, brick, sand and stone, live stock, viz., cattle and horses, and other articles instanced in the bill, while, on the other hand, there will be a reduction as to such commodities as grain, flour, salt, groceries in their several forms, etc. So that it is at once apparent that the Initiative Act, if applied for the regulation of freight rates, will work a very radical change in practically all rates, and require an almost complete readjustment in car load and less than car load rates within the state.

With the policy of the law we have nothing to do. That is a matter solely for the lawmaking power. We can only determine whether the law is consistent with itself so that it is susceptible of practical operation, and whether it stands within the purview of the Constitution, state or national, the court having jurisdiction as a federal court.

From the very nature of things, there are many considerations that enter into the problem of rate-making and rate regulation. They involve the kind and quality of the commodity, the manner in which it is packed or prepared for shipment, the quantity offered, the distance of carriage, the facility with which it may be handled, its weight, bulk, and liability to breakage and deterioration, etc., and many conditions too numerous to specify or mention. Some commodities are well adapted for carriage by less than car load and others by car load, and perhaps not all are suited to carriage by both methods. It becomes manifest, from a consideration of all these conditions and relations, that it is hardly possible to adopt and apply a rigid spread in classification between less than car load and car load, so as to promote the best interests of either the carrier or shipper, or of both. A wide spread in this respect may be admirably suited to the transportation of some commodities, while a narrow one may be much better suited for the handling of other commodities. And so with relation to the distance

of carriage, the extent of the spread might affect distinct localities differently. So that an arbitrary or rigid spread is illy adapted for just, equitable, and reasonable, and, we may say, nondiscriminatory rate-making for all commodities and under all conditions.

Mr. Commissioner Meyer, in the now celebrated case of In the Matter of the Suspension of Western Classification No. 51, I. C. C. No. 9, Opinion No. 2,110, p. 465, has this to say respecting the relation between car load and less than car load rates:

"It appears that an excessive difference between the car load and the less than car load rates on the same commodity results in an undue preference to the car load shipper of that commodity. Both the assignment of a commodity to its place in the classification and the tariff rate made applicable to the respective classes by individual carriers determine the relationship of car load to less than car load shipments expressed in dollars and cents, which, after all, is the relationship which interests the public."

And again (page 467):

"It appears to us that one of the great purposes in the construction of a uniform classification should be the establishment of just relations between car load and less than car load quantities in accordance with some consistent principle throughout the classification and the rate schedules which may be constructed upon it."

The "consistent principle" spoken of is manifestly not the principle of an arbitrary and rigid spread applied to all commodities of whatsoever nature and under all conditions of haul and locality.

This brings us to the second point of real and pivotal significance: Does the act trench upon the natural and constitutional rights of the carrier?

The authority of the people to enact the act under consideration, if valid, is referable to the police power of the state. The United States Supreme Court has held an act of the Legislature of the state of Michigan void as unduly trenching upon the just rights of the carrier, because in violation of that part of the Constitution of the United States which forbids the taking of property without due process of law and requires the equal protection of the laws; the act being one requiring the carrier to sell 1,000-mile tickets to persons contemplating passage over the lines at a less rate than the regular passenger tickets. Lake Shore, etc., Ry. Co. v. Smith, 173 U. S. 684, 19 Sup. Ct. 565, 43 L. Ed. 858. We cannot better set forth the principles upon which the court based its action than to quote from the opinion of Mr. Justice Peckham, and we may be pardoned if we quote therefrom extensively:

"The question is presented in this case whether the Legislature of a state, having power to fix maximum rates and charges for the transportation of persons and property by railroad companies, with the limitations above stated, and having power to alter, amend, or repeal their charters, within certain limitations, has also the right, after having fixed a maximum rate for the transportation of passengers, to still further regulate their affairs and to discriminate and make an exception in favor of certain persons, and give to them a right of transportation for a less sum than the general rate provided by law.

"It is said that the power to create this exception is included in the greater power to fix rates generally; that, having the right to establish maximum rates, it therefore has power to lower those rates in certain cases and in favor of certain individuals, while maintaining them or permitting them to be

maintained at a higher rate in all other cases. It is asserted also that this is only a proper and reasonable regulation.

"It does not seem to us that this claim is well founded. We cannot regard this exceptional legislation as the exercise of a lesser right which is included in the greater one to fix by statute maximum rates for railroad companies. The latter is a power to make a general rule applicable in all cases and without discrimination in favor of or against any individual. It is the power to declare a general law upon the subject of rates beyond which the company cannot go, but within which it is at liberty to conduct its work in such a manner as may seem to it best suited for its prosperity and success. This is a very different power from that exercised in the passage of this statute. The act is not a general law upon the subject of rates, establishing maximum rates which the company can in no case violate. The Legislature, having established such maximum as a general law, now assumes to interfere with the management of the company while conducting its affairs pursuant to and obeying the statute regulating rates and charges, and notwithstanding such rates it assumes to provide for a discrimination, an exception in favor of those who may desire and are able to purchase tickets at what might be called wholesale rates—a discrimination which operates in favor of the wholesale buyer, leaving the others subject to the general rule. And it assumes to regulate the time in which the tickets purchased shall be valid and to lengthen it to double the period the railroad company has ever before provided. It thus invades the general right of a company to conduct and manage its own affairs, and compels it to give the use of its property for less than the general rate to those who come within the provisions of the statute, and to that extent it would seem that the statute takes the property of the company without due process of law. We speak of the general right of the company to conduct and manage its own affairs; but at the same time it is to be understood that the company is subject to the unquestioned jurisdiction of the Legislature in the exercise of its power to provide for the safety, the health, and the convenience of the public, and to prevent improper exactions or extortionate charges from being made by the company. * * *

"The power of the Legislature to enact general laws regarding a company and its affairs does not include the power to compel it to make an exception in favor of some particular class in the community and to carry the members of that class at a less sum than it has the right to charge for those who are not fortunate enough to be members thereof. This is not reasonable regulation. We do not deny the right of the Legislature to make all proper rules and regulations for the general conduct of the affairs of the company, relating to the running of trains, the keeping of ticket offices open, and providing for the proper accommodation of the public. * * *

"Regulations for maximum rates for present transportation of persons or property bear no resemblance to those which assume to provide for the purchase of tickets in quantities at a lower than the general rate, and to provide that they shall be good for years to come. This is not fixing maximum rates, nor is it proper regulation. It is an illegal and unjustifiable interference with the rights of the company.

"If this power exist, it must include the right of the Legislature, after establishing maximum freight rates, to also direct the company to charge less for carrying freight where the party offering it sends a certain amount, and to carry it at that rate for the next two or five or ten years. Is that an exercise of the power to establish maximum freight rates? Is it a valid exercise of the power to regulate the affairs of a corporation? The Legislature would thus permit not only discrimination in favor of the larger freighter as against the smaller one, but it would compel it. If the general power exist, then the Legislature can direct the company to charge smaller rates for clergymen or doctors, for lawyers or farmers or school teachers, for excursions, for church conventions, political conventions, or for all or any of the various bodies that might desire to ride at any particular time or to any particular place.

"If the Legislature can interfere by directing the sale of tickets at less than the generally established rate, it can compel the company to carry certain

persons or classes free. If the maximum rates are too high in the judgment of the Legislature, it may lower them, provided they do not make them unreasonably low as that term is understood in the law; but it cannot enact a law making maximum rates, and then proceed to make exceptions to it in favor of such persons or classes as in the legislative judgment or caprice may seem proper. What right has the Legislature to take from the company the compensation it would otherwise receive for the use of its property in transporting an individual or classes of persons over its road, and compel it to transport them free or for a less sum than is provided for by the general law? Does not such an act, if enforced, take the property of the company without due process of law? We are convinced that the Legislature cannot thus interfere with the conduct of the affairs of corporations."

As has been remarked, this is not an act to fix maximum rates beyond which the charge is rendered unlawful, but it establishes a maximum relative charge for car load transportation in certain percentages of the less than car load rate. It contemplates a fixing of minimum car load weights and of a less than car load rate upon every article or commodity, and then a maximum spread, of absolute proportions, between the less than car load and car load rate, which must be observed under penalty of an infraction of the law.

From the bills of complaint, it appears that reasonable maximum rates have already been established by the State Railroad Commission for the regulation of the transportation companies. Observing these regulations, the companies have been left to the regulation in large measure of the spread between car load and less than car load rates, and it would seem now to fix an absolutely rigid spread, for their observance is unduly trenching upon the just rights of the companies to adjust the relationship. We do not deny that the Legislature, the people, or the Railroad Commission may determine and adopt a reasonable spread as applied to specific commodities and for the protection of given localities; but that is a very different question from one arising from an edict that a certain definite and rigid spread shall be applied to all commodities, whatsoever may be their kind or character, origin of shipment or destination. Indeed, the act would seem to defeat itself. It will either compel the carrier to accept unreasonably low rates on car load lots as it respects some commodities, which would be unjust and confiscatory, or to fix unreasonably high rates on less than car load lots, which the law will not permit, in order to adjust the car load rates within the maximum relative rates for minimum car load weights; or it might constrain the carrier, in order to afford the public a very low rate on commodities that would justify it, to carry the same commodities less than car load, at an unreasonably low rate.

We think that the act is not only violative of the just rights of the carrier to manage his own affairs and exercise his own judgment respecting the spread between car load and less than car load rates, so long as he keeps within the bounds of reasonable maximum rates and does not discriminate between persons and localities, but it would compel him in many instances to accept unreasonably low rates, in order to comply with its provisions and avoid criminal prosecution. It cannot be denied that such an act is violative of his constitutional right, which forbids the taking of property without due process of law

and requires the equal protection of the laws. We conclude therefore that the Initiative Act is unconstitutional and void, and must be so treated.

Based upon these considerations, the injunction prayed must be allowed and made permanent, with costs to the complainants.

This order will obtain in each of the cases.